In The United States District Court
For Southern District Of Ohio, Eastern Division

FILED
JAMES BONINI
CLERK

2009 SEP 18 P 12: 27

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

Romell Broom,

    Plaintiff,

V.

Ted Strickland, et al.,

    Defendants.

Case No. 2:09 cv 823

---

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

---

Plaintiff Romell Broom moves this court for a temporary restraining order and preliminary injunction prohibiting Defendants from proceeding with his execution currently scheduled for September 22, 2009 at 10 a.m. at the Southern Ohio Correctional Facility. The reasons supporting this request are addressed in the attached memorandum in support.

Respectfully submitted,

_/s/ Timothy F. Sweeney_
Timothy F. Sweeney, Esq. (0040027)
LAW OFFICE OF TIMOTHY FARRELL SWEENEY
The 820 Building, Suite 430
820 West Superior Ave.
Cleveland, Ohio 44113-1800
(216) 241-5003   (216) 241-3138 (fax)
Tim@timsweeneylaw.com

_/s/ S. Adele Shank_
S. Adele Shank, Esq. (0022148)
LAW OFFICE OF S. ADELE SHANK
3380 Tremont Road, 2nd Floor
Columbus, Ohio 43221-2112
(614) 326-1217   (614) 326-1028 (fax)
shanklaw@att.net
**Counsel for Petitioner Romell Broom**

In The United States District Court
For Southern District Of Ohio, Eastern Division

Romell Broom,

      Plaintiff,

V.

Ted Strickland, et al.,

      Defendants.

Case No.

## Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction

### I.   Introduction.

Plaintiff Romell Broom filed this action to vindicate his rights under Eighth and Fourteenth Amendments to the United States Constitution. Broom's litigation centers around Defendants' botched efforts to execute him on September 15, 2009 and their express intent to try again on September 22, 2009. Broom argues in his Complaint that Defendants have failed once in trying to execute him. The result was a horrific and torturous event detailed in Broom's affidavit (Exhibit A, Affidavit of Romell Broom). It would be unconstitutional to allow Defendants a second attempt to torture Broom to death. In addition, Broom argues that Defendants' attempt to execute him on September 15 was anything but quick and painless. Finally, he asserts that if Defendants are not disentitled from trying again to execute him, they cannot use the same flawed protocol that they tortured him with on September 15, 2009.

### II.   Facts.

Romell Broom is a death row inmate. He was sentenced to die by lethal injection at the Southern Ohio Correctional Facility on September 15, 2009 at 10:00 a.m. Defendants spent "about two hours" attempting to access a vein. Jon Craig, *Botched execution brings reprieve*,

Cincinnati Enquirer, Sept. 15, 2009 (online version attached as Exhibit B). He was stuck approximately 18 times in efforts to gain venous access. Alan Johnson, *Effort to kill inmate halted,* Columbus Dispatch, Sept. 16, 2009 at A1 (online version attached as Exhibit C). Broom was "clearly frustrated as he leaned back on the gurney, covering his face with his hands and visibly crying." Craig, *Botched execution brings reprieve*. The execution staff moved on to try to place IVs in his legs with Broom grimacing from pain at least four times. Id. "As Broom's anxiety grew, he repeatedly wiped his sweaty forehead with toilet paper." Id. Broom said, that he was in pain. At one point the execution team members were placing needles in areas that were already bruised and swollen. In an attempt to find a vein in his ankle, the execution team member missed and the needle hit his bone. The pain was so severe that it caused him to scream. Exhibit A, ¶18, 20. When the execution team attempted to find a vein in his hands Broom's pain was extreme. By that time eighteen attempts to place the needles had been made. Ex. A, ¶21.

Prior to the execution Broom was denied the right to consult with his counsel privately. During the course of the execution, after it became apparent that the procedure was not proceeding according to Ohio's execution protocol, counsel was denied access to Broom and Broom was denied access to his counsel. Ex. A, ¶18. Counsel was denied use of the telephone in the death house and was not allowed to have cell phone in the death house. Counsel was required to leave the building in order to make telephone calls to co-counsel and others in order to take legal steps to try to stop the execution-gone-wrong.

After more than two hours of poking and prodding that brought Broom to tears, the State of Ohio was required to abandon its efforts to execute Broom for that day because Ohio Governor Ted Strickland issued a one week reprieve during which time the Ohio Department of Rehabilitation and Correction is required to recommend "appropriate next steps" to be used in

3

Broom's next execution attempt. Exhibit D, Reprieve, ¶2. The Governor's reprieve expires on September 22, 2009, at which time Defendants intend to try again to execute Broom.

Neither Broom nor his counsel have been provided any information about the "next steps" that are to be provided to the governor.

### III. Law and argument.

"The purpose of a [temporary restraining order] under Rule 65 is to preserve the status quo so that a reasoned resolution of the dispute may be had." Leaf Funding, Inc. v. Butera, Case No. 3:06-CV-00938, 2006 U.S. Dist. LEXIS 72887 at * 13-14 (M.D. Tenn. Oct. 5, 2006) (citing P & G Co. v. Bankers Trust Co., 78 F.3d 219, 226 (6th Cir. 1996)). In determining whether to grant a temporary restraining order under FRCP 65, the Court must consider the four preliminary injunction factors: "(1) whether the party seeking the order has a strong likelihood of prevailing on the merits of the case; (2) whether the moving party will suffer irreparable injury if the order is not entered; (3) the potential harm the order would cause others; and (4) the public interest." Leaf Funding, Inc., 2006 U.S. Dist. LEXIS 72887 at *7 (citing Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir. 2000)).

The four factors are to be balanced; they are not prerequisites to be met. Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (citing Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir. 2003); In re De Lorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985)). Accordingly, the degree of likelihood of success required to obtain a preliminary injunction, and thus by implication a temporary restraining order, may depend on the strength of the other three factors. See De Lorean Motor Co., 755 F.2d at 1229.

In addition to consideration of the four preliminary injunction factors, Fed. R. Civ. P. 65(b) requires support of the alleged immediate and irreparable injury through affidavit or

4

verified complaint. Plaintiff Broom's affidavit supporting his claims of immediate and irreparable injury is attached as Exhibit A. Finally, counsel is required to certify in writing the "efforts, if any, which have been made" to give notice to the adverse party and the reasons supporting the claim that notice should not be required. Counsel's certification is included at the end of this document.

**A.     Broom has a strong likelihood of success on the merits**

**1.     Repeated attempts unconstitutional**

Broom's litigation centers around Defendants' botched efforts to execute him on September 15, 2009 and their express intent to try again on September 22, 2009. After more than two hours of pain and terror with no results, Ohio plans to subject Broom to this same procedure in a matter of days. As the Supreme Court noted in Baze v. Rees, 128 S. Ct. 1520 (2008), "a hypothetical situation" involving "a series of abortive attempts" at execution *"would present a different case."* Id. at 1531 (citing Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 471 (1947) (Frankfurter, J., concurring) (emphasis added)). "[S]uch a situation ... would demonstrate an 'objectively intolerable risk of harm' that officials may not ignore." Id. (citing Farmer v. Brennan, 511 U.S. 825, 846 and n.9 (1994)). Broom presents that "different" case. Baze, 128 S. Ct. at 1531.

Louisiana ex rel. Francis v. Resweber, 329 U.S. 459 (1947), does not resolve this issue. In Resweber, the Court, in a 4-1-4 decision, approved a second attempt at electrocuting a death-sentenced inmate. In so doing, four justices of Court held, while assuming but not deciding that the Eighth Amendment applied o the states, that there was no violation of the Eighth Amendment prohibition against cruel and unusual punishment when "an accident with no suggestion of malevolence" occurs. Id. at 463-64. While Defendants actions may not rise to "malevolence,"

5

they have certainly demonstrated willful indifference to the problems with Ohio's lethal injection protocol. They have been on notice for more than five years as to potential problems. Moreover, venous access problems have been evident in at least two recent executions.

The fifth vote that allowed the execution of Resweber to go forward came from Justice Frankfurter who fond that the Eighth Amendment did not apply to the states and therefore the test of whether the second execution was cruel and unusual under that amendment was inapplicable. He said, "But the penological policy of a State is not to be tested by the scope of the *Eighth Amendment* and is not involved in the controversy which is necessarily evoked by that Amendment as to the historic meaning of "cruel and unusual punishment.": Id. at 429 (Frankfurter , J. concurring).

Since the decision in Resweber was made, the United States Supreme Court has held that the Eight Amendment is applicable to the states. Robinson v. California, 370 U.S. 660 (1962), Furman v. Georgia, 408 U.S. 238 (1972). Hence Resweber decided today would bar the second execution attempt.

Other Ohio executions have gone wrong. Joseph Clark's execution did not go as ODRC planned. Indeed, Defendants' made several changes to Ohio's lethal injection protocol as a result of the "difficulties encountered during the execution of Joseph Clark on May 2, 2006." Cooey v. Strickland, 479 F.3d 412, 423 (6th Cir. 2007). "When preparing Clark for execution, prison officials could find only one accessible vein in Clark's arms to establish a heparin lock, through which the lethal drugs are administered. (Two locks usually are inserted.) However, once the execution began and the drugs were being administered, this vein collapsed, and Clark repeatedly advised officials that the process was not working. Officials stopped the lethal

injection procedure, and after a significant period of time, were able to establish a new intravenous site." Id. at 423-24.

Then, on May 24, 2007, problems were encountered during Christopher Newton's execution. It took approximately twenty-two minutes to insert the first IV into Mr. Newton's arm. It took approximately one hour and fifteen minutes to place the second IV. Mr. Newton continued to talk for several minutes after the administration of the lethal injection drugs began, which means that the anesthetic drug (Ohio's first of three drugs) did not have its intended effect of immediately rendering Mr. Newton unconscious. Several minutes after the drugs began, Mr. Newton's chest and stomach area moved approximately eight to ten times and his chin moved in a jittery manner, and at 11:45 a.m. his chest moved, which means the paralytic drug (Ohio's second of three drugs) did not have its intended effect. Mr. Newton was pronounced dead some sixteen minutes after the lethal drugs began flowing—about fifty percent longer than Ohio's average of nine to eleven minutes – indicating that the potassium chloride (Ohio's third and final drug) failed to stop Mr. Newton's heart within the time frame predicted by the protocol. See Declaration of Robert K. Lowe, Esq, Regarding the Execution of Christopher Newton, Alderman v. Donald, et al., Case no. 1:07-CV-1474-BBM (N.D. GA) (Ex. A in that litigation) (Exhibit E attached hereto).

In addition, inmate Richard Cooey filed a 42 U.S.C. § 1983 lawsuit on August 7, 2008, urging Defendants to address the issue of compromised veins in its lethal injection protocol. Cooey v. Strickland, et al., Case No. 2:08-cv-747 (S.D. Ohio). While Cooey's lawsuit was dismissed and his execution uneventful, his suit did alert Defendants, once again, that their protocol had no backup plan to address compromised and inaccessible peripheral veins.

Clark and Newton demonstrate that this is not an "isolated mishap." Baze, 128 S. Ct. at 1531. Defendants have been on notice for several years of this problem. They ignored it.

Ohio aborted its attempt to execute Broom, a second attempt would be both cruel and unusual. Broom has a strong likelihood of success on his alleged the Eighth Amendment violation as contemplated by Baze. See 128 S. Ct. at 1531 (citing Resweber, 329 U.S. at 471 (1947) (Frankfurter, J., concurring) ("a hypothetical situation" involving "a series of abortive attempts" at execution "would present a different case.").

## 2. No quick and painless execution

Broom also has a strong likelihood of success on his due process claim relating to O.R.C. § 2949.22. Ohio Revised Code § 2949.22 mandates that lethal injections in Ohio "shall" be quick and painless. State v. Rivera, Case No. 04CR065940, Judgment Entry at p. 5 (Lorain C.P. June 10, 2008) (Exhibit F). This statutory language "demands avoidance of any unnecessary risk of pain, and as well, any unnecessary expectation by the condemned person that his execution may be agonizing, or excruciatingly painful." Id. at 7.

Defendants' September 15, 2009 attempt to execute Broom was anything but "quick" and "painless." Rather Defendants spent "about two hours" attempting to access a vein. Jon Craig, *Botched execution brings reprieve*, Cincinnati Enquirer, Sept. 15, 2009 (online version attached as Exhibit B). He was stuck 18 times in efforts to gain venous access. Alan Johnson, *Effort to kill inmate halted,* Columbus Dispatch, Sept. 16, 2009 at A1 (online version attached as Exhibit C). Broom was "clearly frustrated as he leaned back on the gurney, covering his face with his hands and visibly crying." Craig, *Botched execution brings reprieve.* The staff moved on to try to site IVs in his legs with Broom grimacing from pain at least four teams. Id. "As Broom's anxiety grew, he repeatedly wiped his sweaty forehead with toilet paper." Id

8

Ohio Revised Code § 2949.22 imposes the statutory obligation on Ohio's officials to administer a quick and painless death. "It was the statutory duty of the state officials to make sure there was no failure." Resweber, 329 U.S. at 477 (Burton, J., dissenting with 3 justices). Defendants failed in this duty. Resultantly, there is a strong likelihood that Broom will succeed on this due process claim.

### 3. No execution under this flawed protocol

If Defendants are not precluded from a second attempt at executing Broom, Broom has a strong likelihood of success on the merits of his claim that they certainly are precluded from using the current constitutionally flawed protocol to execute Broom. Defendants may not ignore what is now an "objectively intolerable risk of harm." Baze, 128 S. Ct. at 1531. Ohio's lethal injection protocol does not account for accessing Broom's veins in any manner other than via the peripheral veins. After more than two hours, and 18 sticks, Defendants could not obtain peripheral vein access. There is no backup plan, no alternative access for which Ohio's execution team is trained and prepared to use—if there was Defendants would have utilized that plan rather than post-pone Broom's execution.

Resultantly, one of two things will happen on September 22, 2009—either Defendants will utilize the same torturous methods they abandoned on September 15th or they will implement a procedure that has not been considered, practiced, or vetted. Using this same protocol, which has proven demonstrably flawed, would be ignoring Broom's needs and will lead to an increased likelihood of harm. A viable claim is present in this suit. As four dissenting Supreme Court Justices noted in Resweber, "[a]lthough the failure of the first attempt, in the present case, was unintended, the reapplication of the electric current will be intentional." 329

U.S. at 476 (Burton, J., dissenting). If Defendants utilize the same flawed protocol to torture Broom to death, their actions will be intentional.

The Baze plurality noted the difficulty of finding a procedure that is widely tolerated to be "objectively intolerable." 128 S. Ct. at 1532. Like 36 other states, Ohio's mode of execution is lethal injection. But no other state has the history of repeated botched executions—Clark, Newton, and now Broom. Counsel can find no case where a state has aborted its efforts to execute an inmate because of inability to access a vein. Even the attempts to access Broom's veins have lasted longer than any other documented incident. See http://deathpenaltyinfo.org/some-examples-post-furman-botched-executions visited Sept. 17, 2009 (review of these cases demonstrates that the longest reported attempt at IV access in other states was Arkansas' January 24, 1992 execution of Rickey Ray Rector where it took medical staff more than 50 minutes to find a suitable vein). The risk present in Ohio, particularly with respect to Broom, is objectively intolerable. See Baze, 128 S. Ct. at 1532.

Moreover, all of the Baze opinions make clear that "the constitutionality of a particular method of execution will depend on the specific factual details of its administration." Getsy, 2009 U.S. App. LEXIS 18125 at 30-31 (Merritt, J., dissenting). And, if Defendants intend to use a method unaccounted for in Ohio's lethal injection protocol, then Broom would have yet another vehicle in which to challenge Ohio's lethal injection practices. See Getsy v. Strickland, Case No. 08-4199, 2009 U.S. App. LEXIS 18125 at ** 9-10 (6th Cir. Aug. 13, 2009) (Moore, J., concurring) ("Numerous conceivable protocol changes--for example, a change in the type of drugs that Ohio administers in the current three-drug protocol--would clearly merit resetting the statute of limitations. But I also believe that a less obvious change to the protocol could require a new accrual date as well if the amended protocol posed a "substantial risk of serious harm."

Baze, 128 S. Ct. at 1531-32."). At this time, neither Broom nor his counsel have been informed of the "next steps" required to be identified by Governor Strickland's one week reprieve. If Ohio intends to stray from its written protocol, it must immediately disclose this intent to Broom and describe the new procedures to be used so that he may evaluate the chosen procedure and determine if further legal action is necessary. Cf. Nelson v. Campbell, 541 U.S. 637 (2004) (inmate found out only days before his execution that state intended to use a cut-down procedure to access his veins during his lethal injection).

**B.    Broom will suffer irreparable injury**

Defendants will try again on September 22, 2009 to execute Broom if a restraining order, and subsequent injunction, is not granted—quite possibly causing excruciating agony beyond what he already suffered. Ohio's first botched attempt to execute Broom is stark evidence of this fact. Defendants spent "about two hours" attempting to access a vein. John Craig, *Botched execution brings reprieve*, Cincinnati Enquirer, Sept. 15, 2009 (online version attached as Exhibit B). He was stuck at least 18 times in efforts to gain venous access. Alan Johnson, *Effort to kill inmate halted*, Columbus Dispatch, Sept. 16, 2009 at A1 (online version attached as Exhibit C). Broom was "clearly frustrated as he leaned back on the gurney, covering his face with his hands and visibly crying." Craig, *Botched execution brings reprieve*. The staff moved on to try to site IVs in his legs with Broom grimacing from pain at least four teams. Id. "As Broom's anxiety grew, he repeatedly wiped his sweaty forehead with toilet paper." Id.

There is a serious and compelling risk that Broom will suffer an unconstitutional execution, including several more hours of torturous efforts to gain venous access, should Defendants be allowed to proceed on September 22, 2009. Furthermore, Broom will be unable to consult with counsel if the process begins to go wrong and counsel will be unable to

communicate with Broom under the present system. Without a temporary restraining order, a subsequent preliminary injunction, Broom will suffer irreparable harm.[1]

## C. No substantial harm to others

While recognizing that the State of Ohio has an interest in seeing finality by imposing the sentence of death, substantial harm will not ensue from issuing a temporary restraining order and subsequent preliminary injunction. Broom's execution was botched despite the fact that Defendants have been on notice for more than five years that their protocol presents unconstitutional risks to the condemned inmate based on numerous lawsuits that have been filed by Ohio death row inmates. Moreover, this is not the first time that Ohio has had difficulty gaining peripheral vein access during an inmate's execution. Clark and Newton's executions are detailed elsewhere in this motion and are incorporated herein by reference.

Ohio's system suffers from the flaw—lack of planning and lack of preparation. There is no alternative to peripheral vein access in Ohio's lethal injection protocol, so inmates like Broom, and Clark and Newton before him, are made to suffer repeated needle sticks, hours of poking a prodding. For Broom, he now faces the mental anguish of knowing he will face death again and the real physical pain the same torturous methods may be employed yet again.

Defendants could have avoided this problem had they responded to the five years of litigation asserting there were real problems with Ohio's lethal injection protocol. Any harm to

---

[1] Broom's inability to obtain damages from Defendants in a § 1983 action, should Ohio successfully torture him to death on September 22, 2009, reduces the showing necessary to establish irreparable harm. Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 360 (4th Cir. 1991). A "plaintiff's harm is not irreparable if it is fully compensable by money damages." See Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992) (citing Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir. 1984)). But here, the nature of Broom's loss will make damages difficult, if not impossible, to calculate. See id. ("an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate").

Defendants is obviated by the fact that this is a problem of their own creation, one which they have repeatedly refused to address. Broom should not be penalized by a delay Defendants could have prevented.

**D.     The public interest**

Finally, granting a temporary restraining order and subsequent preliminary injunction would serve the public interest because the public has an interest in the enforcement of constitutional rights. Chabad, 363 F.3d at 436 (citing Chabad of S. Ohio v. City of Cincinnati, 233 F. Supp. 2d 975, 987 (S.D. Ohio 2002); Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County, 274 F.3d 377, 400 (6th Cir. 2001)). While ultimately rejecting the petitioner's claims, the Supreme Court continued to adhere to its case law that the Eighth Amendment prohibits cruel and inhumane executions in Baze.

The public interest will also be served because these problems likely will continue to confront Ohio as the Defendants resume executions in Ohio if they are not forced to confront and remedy this problem. Joseph Clark was not the first person with difficult vein access who Ohio has struggled to execute and Romell Broom will not be the last. Ohio must take real steps to address this problem prior to attempting again to execute Broom. Until it does so, this Court should restrain and enjoin it from inflicting its constitutionally flawed lethal injection protocol on Broom.

The public has an interest in addressing these concerns and ending this litigation. Broom stands ready to present his case on whatever expedited schedule this Court deems appropriate. Indeed, this Court's current scheduling order contemplates a trial on the merits in another lawsuit, Cooey v. Strickland et al, in just over a month. The factual development necessary to

pursue Broom's claims, while significant, will be far less onerous because of the pending litigation.

## IV. Conclusion

The strong likelihood of success weighs in favor of a temporary restraining order and subsequent preliminary injunction in this matter. The four factors this Court must balance weigh in favor of preserving the status quo. Broom respectfully requests that this Court grant a preliminary injunction barring Defendants from executing him until the conclusion of this litigation.

Respectfully submitted,

*/s/ Timothy F. Sweeney*
Timothy F. Sweeney, Esq. (0040027)
LAW OFFICE OF TIMOTHY FARRELL SWEENEY
The 820 Building, Suite 430
820 West Superior Ave.
Cleveland, Ohio 44113-1800
(216) 241-5003    (216) 241-3138 (fax)
Tim@timsweeneylaw.com

*/s/ S. Adele Shank*
S. Adele Shank, Esq. (0022148)
LAW OFFICE OF S. ADELE SHANK
3380 Tremont Road, 2nd Floor
Columbus, Ohio 43221-2112
(614) 326-1217    (614) 326-1028 (fax)
shanklaw@att.net
**Counsel for Petitioner Romell Broom**

## Certification

I hereby certify that counsel spoke to Charles Wille, counsel for Defendants, Friday, September 18, 2009 to advise him of this pleading.

*/s/ S. Adele Shank/*

## Certificate of Service

I hereby certify that the foregoing was filed served by email to Charles Wille, counsel for Defendants, at charles.wille@ohioattorneygeneral.gov this 18th day of September, 2009, and will also be hand-delivered at a hearing later today.

*/s/ S. Adele Shank/*