**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

| | |
|---|---|
| **Richard Cooey**<br>**Kenneth Smith (Inmate #326-630)**<br>**Donald Ketterer (Inmate #465-959)**<br>    **Mansfield Correctional Institution**<br>    **PO Box 788**<br>    **Mansfield, Ohio 44901**<br>**Jonathon Monroe (Inmate #383-816)**<br>**Jerome Henderson (Inmate #357-869)**<br>**Clarence Cater (Inmate #213-146)**<br>**Billy Slagle (Inmate #203-172)**<br>**Grady L. Brinkley (Inmate #436-028)**<br>**James T. Conway, III (Inmate #457-203)**<br>**Nathaniel E. Jackson (Inmate #440-891)**<br>**Robert Bethel (Inmate #455-970)**<br>**Phillip L. Elmore (Inmate #207-889)**<br>**Shawn Hawkins (Inmate #264-900)**<br>    **Ohio State Penitentiary**<br>    **878 Coitsville-Hubbard Rd.**<br>    **Youngstown, Ohio 44505**<br><br>       *Plaintiffs*,<br><br>**v.**<br><br>**John Kasich, Governor of Ohio**<br>    **77 South High St., 30th Floor**<br>    **Columbus, Ohio 43215**<br>**Gary C. Mohr, Director, ODRC**<br>    **77 W. Broad St.**<br>    **Columbus, Ohio 43222**<br>**Donald Morgan, Warden**<br>    **Southern Ohio Correctional Facility**<br>    **1724 State Rt. 728**<br>    **Lucasville, Ohio 45699**<br>**Anonymous Execution Team Members #1-**<br>**50 (names and addresses unavailable to**<br>**Plaintiffs)**<br>    **c/o SOCF**<br>    **1726 State Rt. 728**<br>    **Lucasville, Ohio 12366**<br>**Richard Theodore, Director of Pharmacy**<br>    **Oakwood Correctional Facility**<br>    **3200 N. West**<br>    **Lima, Ohio 45801,** | **Case No. 2:04-cv-1156**<br><br>**District Judge Gregory L. Frost**<br><br>**Magistrate Judge Mark R. Abel** |

| | |
|---|---|
| *Defendants*. | |
| **Brett Hartman (Inmate #357-869)**<br>      **Ohio State Penitentiary**<br>      **878 Coitsville-Hubbard Rd.**<br>      **Youngstown, Ohio 44505**<br>            *Plaintiff*,<br>      **v.**<br><br>**John Kasich, et. al.,**<br>      *Defendants*. | **Case No. 2:09-cv-242**<br><br>**District Judge Gregory L. Frost**<br><br>**Magistrate Judge E. A. Preston Deavers** |
| **Romell Broom (Inmate #187-343)**<br>      **Ohio State Penitentiary**<br>      **878 Coitsville-Hubbard Rd.**<br>      **Youngstown, Ohio 44505**<br>            *Plaintiff*,<br>      **v.**<br><br>**John Kasich, et. al.,**<br>      *Defendants*. | **Case No. 2:09-cv-823**<br><br>**District Judge Gregory L. Frost**<br><br>**Magistrate Judge Mark R. Abel** |
| **Lawrence Reynolds**<br><br>            *Plaintiff*,<br>**Arthur Tyler (Inmate #175-637)**<br>**Johnnie Baston (Inmate #308-174)**<br>      **Ohio State Penitentiary**<br>      **878 Coitsville-Hubbard Rd.**<br>      **Youngstown, Ohio 44505**<br>            *Intervener-Plaintiffs*<br>      **v.**<br><br>**John Kasich, et. al.,**<br>      *Defendants*. | **Case No. 2:10-cv-27**<br><br>**District Judge Gregory L. Frost**<br><br>**Magistrate Judge Terrence P. Kemp** |

---

**Plaintiffs Johnnie Baston, Robert Bethel, Romell Broom, Clarence Carter, James Conway, Shawn Hawkins, Nathaniel Jackson, Donald Ketterer, Billy Slagle, and Arthur Tyler's Amended Complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit Pursuant to 42 U.S.C. § 1983**

---

The above listed Plaintiffs represented by the Office of the Ohio Public Defender, pursuant to Rules 15(a) and 15(d) of the Federal Rules of Civil Procedure, and having sought and been granted leave to do so, (*see* ECF No. 891, Page ID 22290, ¶ 8), hereby file this Omnibus Amended Complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit Pursuant to 42 U.S.C. § 1983 against Defendants John Kasich, et al., (hereinafter the "Amended Complaint"), in each of the applicable consolidated above-captioned cases.  Unless specified by name, each Plaintiff individually alleges and avers as follows:

## I.  NATURE OF THE ACTION

1. Plaintiffs bring this action under 42 U.S.C. § 1983 for violations and threatened violations of their right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments, their right to be free from violations of their substantive and procedural due process rights under the Fourteenth Amendment, their right to unfettered access to counsel and the courts during the execution process under the Sixth and Fourteenth Amendments, their right to equal protection under the laws as guaranteed by the Fourteenth Amendment, and their rights to access to the court guaranteed by the First and Fourteenth Amendments.  Plaintiffs seek equitable, injunctive, and declaratory relief.

2. Defendants' policies, protocol, practices, customs, and procedures for executing Plaintiffs' death sentences through lethal injection present a

substantial risk of serious physical and psychological pain to each Plaintiff. In addition the execution of any of the plaintiffs will involve a torturous or lingering death, that will not accord with the "dignity of man" as required by well-settled principles of the Eighth Amendment.

3. Defendants' policies, protocol, practices, customs, and procedures violate Plaintiffs' rights under the Fourteenth Amendment because they will not result in a painless or quick death, contrary to their respective interests in expecting and receiving a quick and painless death created by Revised Code § 2949.22(A).

4. Defendants' policies, protocol, practices, customs, and procedures violate Plaintiff's rights to access to counsel and the courts during their individual executions in violation of the First, Sixth, Eighth, and Fourteenth Amendments.

5. Defendants have demonstrated a pattern of deviating from the informal and formal written policies, protocol, practices, customs, and procedures, without any legitimate governmental interest. Combined with the nearly limitless discretion vested in certain actors in the execution process, means that Plaintiffs' death sentences will be administered in a manner such that Plaintiffs will each be arbitrarily and irrationally treated differently than similarly situated individuals, in a such a manner that violates their rights under the Fourteenth Amendment's Equal Protection Clause. Defendants' deviations also

burden Plaintiffs' fundamental rights under the First, Sixth, Eighth and Fourteenth Amendments.

## II.  JURISDICTION AND VENUE

6.   This action arises under 42 U.S.C. § 1983 for violations of the First, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights violations and equitable relief under an act of Congress), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (preliminary and permanent injunctive relief).

7.   This Court has personal jurisdiction over Defendants as they are residents of the State of Ohio, are presently located in the State of Ohio, and are elected or appointed officials of the State of Ohio or otherwise acting on behalf of the State of Ohio.

8.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## III.  PARTIES

9.   All Plaintiffs are United States citizens and residents of the State of Ohio.

10.   All Plaintiffs are currently death sentenced inmates in the custody of Defendants.

11.   All Plaintiffs are under the control and supervision of the State of Ohio Department of Rehabilitation and Correction ("DRC").

12. If each Plaintiffs' capital conviction or death sentence is not overturned in another judicial proceeding or through executive clemency, then Defendants will execute that Plaintiff.

13. Upon information and belief, it is the intent of Defendants, acting in concert with other individuals not named as defendants, to use their lethal injection policy described herein to execute each Plaintiff in the death house located on the grounds of the Southern Ohio Correctional Facility ("SOCF") in Lucasville, Ohio, which is operated and controlled by the Defendants.

14. Plaintiff Romell Broom is incarcerated at the Ohio State Penitentiary ("OSP") in Youngstown, Ohio, under Inmate # A-187-343. Plaintiff Broom does not have an execution date. Broom was the subject of a failed execution attempt by Defendants on September 15, 2009, during which he was subjected to extreme and unnecessary cruelty and wanton pain.

15. Plaintiff Arthur Tyler is incarcerated at OSP under Inmate # 175-637. Plaintiff Tyler does not have an execution date.

16. Plaintiff Johnnie Baston is incarcerated at OSP under Inmate # 308-174. Plaintiff Baston has a scheduled execution date of March 10, 2011.

17. Plaintiff Clarence Carter is incarcerated at OSP under Inmate # 213-146. Plaintiff Carter has a scheduled execution date of April 12, 2011.

18. Plaintiff Billy Slagle is incarcerated at OSP under Inmate # 203-172. Plaintiff Slagle has a scheduled execution date of September 20, 2011

19. Plaintiff James T. Conway III is incarcerated at OSP under Inmate # 457-203.  Plaintiff Conway does not have an execution date.

20. Plaintiff Nathaniel Jackson is incarcerated at OSP under Inmate # 440-891.  Plaintiff Jackson does not have an execution date.

21. Plaintiff Robert Bethel is incarcerated at OSP under Inmate # 455-970. Plaintiff Bethel does not have an execution date.

22. Plaintiff Donald Ketterer is incarcerated at the Mansfield Correctional Institution in Mansfield, Ohio under # 465-959.  Plaintiff Ketterer does not have an execution date.

23. Plaintiff Shawn Hawkins is incarcerated at OSP under Inmate # 264-900. Plaintiff Hawkins has a scheduled execution date of June 14, 2011.

24. Defendant John Kasich is the Governor of the State of Ohio and has been since on or about January 1, 2011.  He is the final executive authority in the state, statutorily and constitutionally, responsible for the execution of all death sentences in Ohio and the manner in which those sentences are executed.  He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

25. Defendant Gary C. Mohr is the Director of DRC, a department of the State of Ohio that was created and is maintained pursuant to Ohio Revised Code § 5120.  Defendant Mohr is charged with and authorized under Ohio Revised Code § 5120.01 to prescribe and direct the promulgation of rules and regulations for the DRC, including the rules and regulations for the conduct of prison operations and execution

procedures. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

26. Defendant Donald Morgan is Warden of the Southern Ohio Correctional Facility ("SOCF"), a correctional institution of the DRC that was created and is maintained pursuant to Ohio Revised Code § 5120.05. SOCF is the prison where Ohio carries out its death sentences. Pursuant to Ohio Revised Code § 5120.38, Defendant Morgan, as the Warden of SOCF, is charged with management of SOCF and the oversight and conduct of operations at SOCF, including executions carried out there. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

27. The unnamed and anonymous execution team members are individuals involved with administering Defendants' execution policy at SOCF. They are sued in their official capacities for the purpose of obtaining declaratory and injunctive relief.

28. Defendant Richard Theodore is the Director of Pharmacy at Oakwood Correctional Facility, a DRC facility in Lima, Ohio. On information and belief, Defendant Theodore is one of the individuals primarily responsible for obtaining and supplying the necessary drugs to individuals at SOCF during executions. He is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

29. Defendants, and each of them at all times relevant hereto, are acting in their respective official capacities with respect to all acts described

8

herein, and are, in each instance, acting under the color and authority of state law. Upon information and belief, unless preliminarily and permanently enjoined, the Defendants, and each of them, intend to act in their respective official capacities and under the authority of state law by executing Plaintiffs.

## IV.  FACTS COMMON TO ALL CLAIMS AND RELIEF SOUGHT

30.   Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten.

31.   Defendants formally adopted a written lethal injection policy with an effective date of November 30, 2009 and designated DRC Policy 01-COM-11, in which they adopted a new execution method.

32.   That policy was superseded by the policy designated DRC Policy 01-COM-11 with an effective date of November 15, 2010.

33.   On February 7, 2011, Defendants gave formal notice that they intend to supersede the November 15, 2010 written policy with another superseding version of DRC Policy 01-COM-11.

34.   The new written execution policy is also designated DRC Policy 01-COM-11, and Defendants have assigned it an "Effective Date" of March 9, 2011. (Doc. 893)

35.   Upon information and belief, Defendants will employ an execution policy encompassing their informal execution policies, as well as the written

execution policy designated DRC Policy 01-COM-11 that is in effect at the operable time, to execute each and all Plaintiffs.

36. Among Defendants' informal execution policies are the following:

    36.1. If Defendants do not have 10 grams of the Plan A drug in the Death House, Defendants will not commence an execution using the "Plan B" method.

    36.2. Defendants will only use Plan B if Plan A is attempted and then abandoned or if it is determined prior to the execution date that Plan A will not be successful.

    36.3. Defendants will not use imported execution drugs.

    36.4. Defendants will use only execution drugs that are pure, unadulterated, unexpired, not compounded, and in the sealed, original manufacturer's packaging.

37. Also among Defendants' informal execution policies are the following related, but discrete, provisions related to any intent or action by Defendants to change their written execution policy:

    37.1. A "notice" provision stating that Defendants "will provide notice to the Court, to a condemned inmate's counsel and to plaintiffs' counsel (if different) within a reasonable time period (no less than 30 days) before an execution if [DRC] intends to change the written execution policy, ODRC Policy 01-COM-11," (ECF No. 817-1, PageID 17565), and;

37.2.  A "reprieve" provision stating that "[c]oncurrent with such notice to counsel, [Defendants] will seek a reprieve from the Governor related to that condemned inmate's execution, *provided that* the execution is scheduled to take place less than thirty days *from the effective date* of the change in policy" (*id.* (emphases added)).

38.  Plaintiff Johnnie Baston has a scheduled execution date of March 10, 2011.

39.  Defendants' current written execution policy contains two methods by which Defendants may administer a lethal injection execution: "Plan A" and "Plan B."

40.  Under Defendants' informal policy and their written execution policy, and regardless of whether Plan A or Plan B is used to inject the lethal drugs, a condemned inmate will be forced to lie down flat on his or her back for periods of time.

41.  Executions are scheduled for 10:00 a.m., though Defendants may start later.

42.  Defendants' informal and formal, written execution policies will deny a condemned inmate access to counsel, and hence denied access through counsel to the courts, after 8:45 a.m. on the morning of a scheduled execution.

43.  Should counsel need to access the federal or state courts or others such as the Governor of Ohio, counsel will be forced to leave the presence of the condemned inmate. Counsel for the condemned inmate are only

permitted to access a telephone, laptop computer or other communication device if counsel leaves the Death House after obtaining an official escort to walk more than three hundred feet to a separate building.

44. Ohio's statute governing lethal injection mandates that Defendants conduct executions that produces a "quick and painless" death.

**Plan A of Defendant's Execution Policy**

45. Plan A in Defendants' written execution policy effective March 9, 2011 provides that Defendants employ a single 5-gram dose of pentobarbital, administered via peripheral IV injection and that Defendants have available a 5-gram dose of pentobarbital in the equipment room for use if necessary.

46. Upon information and belief, the injection of five grams of pentobarbital via peripheral IV has never been used in the United States to cause the death of a human being; it has never been vetted or studied in a peer-reviewed scientific or medical journal regarding the effects of that dosage upon a human being; and there exists no data in peer-reviewed scientific or medical journals (as compared to other barbiturates) regarding the pharmacological or pharmokinetic impact of that dosage of pentobarbital, even assuming it is successfully delivered into a human beings vascular system.

47. Based on the current medical and scientific data, Defendants cannot say that their "Plan A" pentobarbital protocol will cause the death of all

condemned inmates, because some inmates will likely be pronounced dead only to revive and return to a state of consciousness after having been administered a 5g dose of Pentobarbital.

48.     Upon information and belief, Anonymous Execution Team Members ("TM") ## 9, 17, and 21 comprise the medical team that establishes peripheral IV access on the inmate in an execution using Plan A. TM # 9 and TM # 17 have served on the medical team for several years. TM # 9, TM # 17, and TM # 21 have been the primary "medical team" members for every execution or execution attempt starting with the John Fautenberry execution on July 14, 2009.

49.     The medical team members responsible for establishing peripheral IV access under Plan A for Kenneth Biros's execution needed approximately half an hour and approximately 9-10 needle sticks to establish and sustain a single IV site for him.

50.     These same medical team members were unable to achieve and/or sustain access to Plaintiff Romell Broom's peripheral veins over the course of two hours.

51.     Additional executions since Broom and Biros have demonstrated difficulty establishing peripheral IV access in the condemned inmate.

52.     Upon information and belief, these three team members will be the individuals responsible for establishing peripheral IV site(s) in Plaintiffs.

**Plan B of Defendant's Execution Policy**

53.     Plan B in Defendants written execution policy provides for an intramuscular injection containing 10 mg of midazolam and 40 mg of hydromorphone.

54.     Plan B has never been used in a human execution anywhere in the world.

55.     Plan B will produce a slow transition to unconsciousness.

56.     When drugs seep into the inmate's circulation from an intramuscular injection, the speed of onset of their effects is greatly reduced when compared with intravenous administration.

57.     During the time it takes for the hydromorphone and midazolam to seep through the muscle tissue and into the circulatory system via the capillary vessels, the inmate will progress through increasingly severe impairments of his or her cognitive faculties.

58.     The inmate may experience and display any of a broad suite of the manifestations of intoxication, including the following:

> A.     Confusion
> B.     Combativeness
> C.     Disinhibited speech
> D.     Delirium
> E.     Anxiety
> F.     Fear
> G.     Euphoria
> H.     Dysphoria
> I.     Delusional ideation
> J.     Hallucinations
> K.     Sensory distortions
> L.     Disorientation

59. Some inmates exposed to this Plan B will, through reasons beyond their control, produce a behavioral spectacle that is disturbing and offensive to the conscience of the witnesses, staff, citizenry, and courts.

60. Nausea and vomiting are well-recognized and well-documented side effects of opioid narcotics such as hydromorphone.

61. "A few papers suggest that hydromorphone may produce fewer side effects (nausea, pruritus) than morphine, but the evidence for this is weak." Mark Dershwitz & C.E. Rosow, *Pharmacology of Opioid Analgesics*, ANESTHESIOLOGY, D.E. Longnecker et al. eds., McGraw-Hill 3d ed. 2008, p. 883.

62. Additionally, "[o]pioids suppress cough [reflexes] by depressing cough centers in the medulla [the part of the brain that controls autonomic functions]." *Id.* at 876.

63. Thus, it is inevitable that a significant number of inmates who are subjected to Plan B will become nauseated and will vomit before they lose consciousness but after their cough reflex is depressed.  Among those inmates, it is an unacceptable if not inevitable risk that some of them will experience painful choking on their own vomit.  And it is inevitable that some of those who vomit will do so while still conscious but under enough of the effect of the drugs as to have their cough reflex depressed, which will result in inhaling vomitus.  When that vomitus contains particulate matter from a recent meal (*e.g.*, the breakfast served to the inmates on the morning of their 10:00 a.m. execution), it will cause

death by asphyxiation. When that vomitus does not contain particulate matter, it will cause extreme pain and suffering as the stomach acids come in contact with the upper airway passages.

64. These and other risks associated with the condemned inmate's ability to breath, and thus to not be tortured before unconsciousness sets in, are rendered all the more substantial and certain by the fact the inmate being executed using Plan B, like with Plan A, is immobilized in a supine position, thereby thwarting reflexive and instinctive self-preservation efforts, such as attempts to turn face down when vomiting.

65. The painful condition of biliary colic is a well-documented side effect of opioid narcotics such as hydromorphone. "Opioids cause contraction of the smooth muscle in the gall bladder and spasm of the sphincter of Oddi. In some individuals this can precipitate biliary colic. The pain is steady, starts rapidly and lasts at least 30 minutes and up to several hours. There may be radiation to the back and shoulders and other concomitant symptoms such as vomiting and diarrhea." Mark Dershwitz & C.E. Rosow, *Pharmacology of Opioid Analgesics*, ANESTHESIOLOGY, D.E. Longnecker et al. eds., McGraw-Hill 3d ed. 2008, p. 879. Thus, it is inevitable that a significant number of inmates who are subjected to Plan B will suffer the pain of biliary colic before they lose consciousness.

**Impact of Plan A and Plan B on Plaintiffs**

66. Upon information and belief, because of Plaintiff Broom's individual physical and psychological characteristics and conditions, achieving

16

peripheral IV access on him will present a situation analogous to previous efforts to achieve peripheral IV access on him or on Kenneth Biros, resulting in severe, torturous pain that is objectively intolerable. Plaintiff Broom's individual physical and psychological characteristics and conditions indicate that employing Plan A to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable. Likewise, Plaintiff Broom's individual physical and psychological characteristics and conditions will result in a substantial risk that Plan B will not have the effect upon him as Defendants claim, resulting in a lingering death that is both physically and psychologically torturous.

67.     Upon information and belief, because of Plaintiff Tyler's individual physical and psychological characteristics and conditions, achieving peripheral IV access on him will present a situation analogous to previous efforts to achieve peripheral IV access on Plaintiff Broom or on Kenneth Biros. This will result in severe, torturous pain that is objectively intolerable. Plaintiff Tyler's individual physical and psychological characteristics and conditions indicate that employing Plan A to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.  Likewise, Plaintiff Tyler's individual physical and psychological characteristics and conditions indicate that employing Plan B to execute him will subject him to a substantial risk of serious pain,

needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

68.     Upon information and belief, Plaintiff Baston's individual physical and psychological characteristics and conditions indicate that achieving peripheral IV access on him will present a situation analogous to previous efforts to achieve peripheral IV access on Plaintiff Broom or on Kenneth Biros, resulting in severe, torturous pain that is objectively intolerable. Plaintiff Baston's individual physical and psychological characteristics and conditions indicate that employing Plan A to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable. Likewise, Plaintiff Baston's individual physical and psychological characteristics and conditions indicate that employing Plan B to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

69.     Upon information and belief, Plaintiff Carter's individual physical and psychological characteristics and conditions indicate that achieving peripheral IV access on him will present a situation analogous to previous efforts to achieve peripheral IV access on Plaintiff Broom or on Kenneth Biros, resulting in severe, torturous pain that is objectively intolerable. Plaintiff Carter's individual physical and psychological characteristics and conditions indicate that employing Plan A to execute

him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable. Likewise, Plaintiff Carter's individual physical and psychological characteristics and conditions indicate that employing Plan B to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

70.    Upon information and belief, Plaintiff Slagle's individual physical and psychological characteristics and conditions indicate that achieving peripheral IV access on him will present a situation analogous to previous efforts to achieve peripheral IV access on Plaintiff Broom or on Kenneth Biros, resulting in severe, torturous pain that is objectively intolerable. Plaintiff Slagle's individual physical and psychological characteristics and conditions indicate that employing Plan A to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable. Likewise, Plaintiff Slagle's individual physical and psychological characteristics and conditions indicate that employing Plan B to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

71.    Upon information and belief, Plaintiff Conway's individual physical and psychological characteristics and conditions indicate that achieving

19

peripheral IV access on him will present a situation analogous to previous efforts to achieve peripheral IV access on Plaintiff Broom or on Kenneth Biros, resulting in severe, torturous pain that is objectively intolerable. Plaintiff Conway's individual physical and psychological characteristics and conditions indicate that employing Plan A to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable. Likewise, Plaintiff Conway's individual physical and psychological characteristics and conditions indicate that employing Plan B to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

72.     Upon information and belief, Plaintiff Jackson's individual physical and psychological characteristics and conditions indicate that achieving peripheral IV access on him will present a situation analogous to previous efforts to achieve peripheral IV access on Plaintiff Broom or on Kenneth Biros, resulting in severe, torturous pain that is objectively intolerable. Plaintiff Jackson's individual physical and psychological characteristics and conditions indicate that employing Plan A to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable. Likewise, Plaintiff Jackson's individual physical and psychological characteristics and conditions indicate that employing Plan

20

B to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

73. Upon information and belief, Plaintiff Bethel's individual physical and psychological characteristics and conditions indicate that achieving peripheral IV access on him will present a situation analogous to previous efforts to achieve peripheral IV access on Plaintiff Broom or on Kenneth Biros, resulting in severe, torturous pain that is objectively intolerable. Plaintiff Bethel's individual physical and psychological characteristics and conditions indicate that employing Plan A to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable. Likewise, Plaintiff Bethel's individual physical and psychological characteristics and conditions indicate that employing Plan B to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

74. Upon information and belief, Plaintiff Hawkins's individual physical and psychological characteristics and conditions indicate that achieving peripheral IV access on him will present a situation analogous to previous efforts to achieve peripheral IV access on Plaintiff Broom or on Kenneth Biros, resulting in severe, torturous pain that is objectively intolerable. Plaintiff Hawkins's individual physical and psychological

characteristics and conditions indicate that employing Plan A to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable. Likewise, Plaintiff Hawkins's individual physical and psychological characteristics and conditions indicate that employing Plan B to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

75. Upon information and belief, Plaintiff Ketterer's individual physical and psychological characteristics and conditions indicate that achieving peripheral IV access on him will present a situation analogous to previous efforts to achieve peripheral IV access on Plaintiff Broom or on Kenneth Biros, resulting in severe, torturous pain that is objectively intolerable. Plaintiff Ketterer's individual physical and psychological characteristics and conditions indicate that employing Plan A to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable. Likewise, Plaintiff Ketterer's individual physical and psychological characteristics and conditions indicate that employing Plan B to execute him will subject him to a substantial risk of serious pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

76.     Each and all Plaintiffs will also suffer serious physical and/or psychological pain and suffering and a lingering, slow death if Defendants first attempt to execute each of them via Plan A, then abandon Plan A after injecting the sodium thiopental and/or pentobarbital, and implement Plan B.

**Problems with the Written Policy**

77.     Plan B will only be used if the execution team is unable to obtain and sustain peripheral IV access and the Director and Warden decide not to use IV administration or if injection of drugs via an IV is initiated and then abandoned.

78.     Plaintiffs will be subjected to attempts to site an IV catheter that may last in excess of thirty minutes while forced to lie supine regardless of any unique factors presented by the inmate's physical and/or psychological condition and history.

79.     Defendants' policy continues to use untrained and insufficiently competent medical technicians to insert the IV catheters into the inmate's veins.

80.     Defendants' policy lacks any restraint on the number of attempts or length of time the medical team can spend at peripheral IV access. Defendants have shown a willingness to engage in multiple, lengthy attempts at establishing and/or sustaining peripheral IV access.

81.     Under the terms of Ohio's written policy, the personnel attempting to administer the policy may not have had any hands-on experience for

23

many years, and may in fact not have the currency of practice necessary to maintain the manual skills and dexterity that are necessary to place IV lines.

82. The policy lacks instructions for detecting and correcting IV infiltration.

83. According to former DRC Director Terry Collins's affidavit, if the prisoner does not exhibit unconsciousness and lack of respiration, additional drug under Plan A may be administered.  If the first dose of the Plan A drug failed to take effect because it infiltrated, however, administration of an additional dose would result in the further infiltration and accumulation of the Plan A drug in the tissue surrounding the vein.  This in turn would result in significant or agonizing pain to the prisoner. Defendants' policy mandates that execution team members must receive specific training before they commence service on the execution team, and at least once a year.  The policy lacks any enforcement mechanism or consequence for not having undergone this training.

84. Defendants' policy requires rehearsal training in advance of a particular execution for all execution team members who will participate in that execution.  Various team members have failed to participate in the mandatory execution team training, but those team members have still participated in subsequent executions. Defendant's policy lacks any enforcement mechanism or consequence for missing one or any number of rehearsals in advance of a particular execution.

85. Defendants' policy provides unfettered discretion to the team members and the supervisory personnel.

86. The medical team members, along with other members of the execution team, are still not undergoing the training and rehearsals required by the written policy, and/or are not required to have used their IV-setting skills regularly.

87. TM # 9 is a phlebotomist employed by DRC who draws blood as part of her daily work. She does not set IV catheters as a part of her daily work.

88. Drawing blood through a simple hollow needle is critically different from setting an IV with a needle housed in a catheter that must be set much more precisely within a vein so that the pressure of fluid infused—not simply blood flowing out under its own pressure— does not rupture the vein or dislodge the catheter.

89. TM # 17 is a full-time corrections officer employed by DRC. He does not set IV catheters as part of his job, nor does he use his EMT-Intermediate training as part of his job. The only exposure he has to setting IVs, outside of his work as an execution team member, comes from his part-time work as a volunteer EMT-Intermediate.

90. TM # 21 is also a full-time DRC employee. He is a former corrections officer. His employment with DRC, outside of his work as an execution team member, does not require him to set IV catheters or use his EMT training on a daily or even regular basis. He is licensed as an EMT-Paramedic, but, by his own admission, he has not worked as an EMT for

several years. Aside from his participation as a medical team member during executions since July 14, 2009, TM # 21 has not regularly set or administered IVs in live patients since approximately 2004.

91. The current written policy only requires Defendants to establish a single IV site rather than an additional backup site.

92. If the first IV site fails the inmate will have to lie supine, strapped to the execution bed and in a state other than unconsciousness, from the time when the failure of the single IV line occurs to the time a new injection is possible.

93. Defendants' policy does not clearly state who decides whether to switch IV sites in case of a problem during the execution.

**<u>Defendant's Pattern of Deviating from the Written Execution Policy</u>**

94. Upon information and belief, Defendants' pattern of deviations from their informal and formal, written policies' requirements includes the following:

94.1. Defendants fail to follow its policies related to the execution drugs, including but not limited to its policies controlling acquisition, possession, delivery and the nature of the execution drugs. Upon information and belief, this includes obtaining execution drugs unlawfully from a third-party vendor by an execution team member not legally allowed to posses or distribute the drugs, and/or obtaining or using, as a primary dose or backup dose, expired execution drugs.

94.2.   Defendants fail to follow its policies' unambiguous requirements related to the training and qualifications of personnel involved in an execution.  This includes a disregard for the mandated presence of at least two medical team members in the "equipment room" during administration of the lethal drugs, and for other execution-related tasks such as obtaining peripheral IV access, recording the events of the execution process and handling, delivery and preparation of the execution drugs.

94.3.   Defendants fail to follow its policies' mandates regarding vein assessments of the condemned inmate.

94.4.   Defendants fail to follow its policies' mandates regarding creation of a detailed and accurate "timeline" log that includes any and all events of significance from the time a condemned inmate arrives at SOCF the day before the scheduled execution.

94.5.   Defendants regularly and continuously fail to follow its policies' critical and explicit training requirements. Defendants claim the authority to simply not attend execution rehearsal training, and/or to waive these requirements whenever it is convenient.

94.6.   Defendants could not have conducted, and, upon information and belief, did not conduct, the required training on the four required topics, (01-COM-11, at & VI.B.1.b), in advance of the execution of Kenneth Biros on December 8, 2009.

94.7. Defendants could not have conducted, and, upon information and belief, did not conduct, the appropriate and required minimum of four days of rehearsals in advance of the Biros execution given the compressed timeline between the effective date of the November 30, 2009 written policy and Biros's execution on December 8, 2009.

94.8. Defendants have consistently permitted execution team members who have not received the mandatory training and/or missed execution rehearsals to participate in the subsequent execution(s).

94.9. Upon information and belief, TM # 21 still has not received all the training required under the policies.

94.10. Upon information and belief, TM # 21 also did not participate in all of the required rehearsal sessions prior to the Broom execution. TM # 21 was one of the two team members primarily responsible for establishing and/or sustaining peripheral IV access in Plaintiff Broom.

94.11. Former Warden Kerns did not participate in all of the Broom execution rehearsal sessions.

94.12. TM # 17 has also failed to attend execution rehearsals, training sessions, and/or executions themselves, leaving TM # 21 alone to conduct at least one execution unsupervised and unchecked by another medical team member.

94.13. Current Warden Morgan failed to attend all the required training sessions required under the various written policies.

94.14. Defendants fail to follow their policies' mandates to properly document and verify correct drug preparation, dosage and disposal of the execution drugs.

94.15. Defendants fail to keep accurate records involving the drug(s) or fail to create any records at all.

94.16. Defendants fail to follow the written policy's mandate that they keep an adequate supply of the execution drug(s) on hand for use as full back-up dose(s) during an execution.

94.17. Defendants fail to follow their policies when they do not properly verify and document execution team members' credentials and certifications, either yearly or before the "initial training session" for each execution.

94.18. Defendants fail to follow their policies when they fail to halt, assess and restart an execution as necessary if a problem is observed during administration of the policy.

95. Defendants' history of administering executions in Ohio is marred by repeated irregularities and deviations from the written policy in the course of actual executions:

95.1. On February 19, 1999 Defendants executed Wilford Berry. Upon information and belief, the members of Berry's execution team could not locate a vein for the IV line, so they resorted to beating

his arms in order to raise a vein adequate to acquire an IV site for the transmission of the lethal drugs into his body.

95.2. On May 2, 2006 Defendants executed Joseph Clark. Prison officials found only one accessible vein in Clark's arms to establish a heparin lock instead of the required two sites. Once Defendants and their agents began administering the drugs, the vein collapsed. Clark informed the execution team that the process was not working. The execution was halted. After more than 90 minutes of additional attempts to establish a viable IV injection site, including consideration of nontraditional injection sites, the execution team established one new IV site through which the lethal drugs were eventually administered.

95.3. On May 24, 2007, Defendants executed Christopher Newton. It took approximately twenty-two minutes to insert the first IV into Newton's arm. It took approximately one hour and fifteen minutes to place the second IV. In fact, placing the IVs took so long that Newton was given permission to get up from the bed and go to the bathroom.

95.4. On June 3, 2009, Defendants executed Daniel Wilson. Defendants did not conduct the required assessment of Wilson's veins the morning of the execution.

95.5. On July 20, 2009, Defendants executed Marvallous Keene. TM # 17 (the "executioner") and TM # 21 (the back-up executioner, and

the observer on hand in the Equipment Room with TM # 17) were each aware of a problem with one IV bag and line during the Marvellous Keene execution. Defendants completed the execution rather than stop and identify the problem as required by the policy.

95.6. On September 15, 2009, Defendants attempted to execute Plaintiff Broom. The evidence demonstrates myriad deviations from the written protocol during the Broom execution attempt.

95.6.1. Defendants failed to conduct the mandatory venous access assessments on Broom.

95.6.2. Defendants unsuccessfully attempted to insert IV lines in eighteen different spots on Broom's body, making approximately fifty needle insertions over the course of two hours.

95.6.3. Defendants attempted to establish an operable IV by repeatedly inserting IV catheters into the crooks of both of Broom's elbows (the antecubital area), his left biceps, his left wrist, the base of his thumb on each hand, over the knuckles on the back of his right hand, the top of his left foot, and his right medial malleolus (ankle bone on the inside part of the ankle).

95.6.4. During Defendants' repeated attempts to establish and/or sustain IV access in Broom, venous access was obtained

31

on at least two different occasions. Upon information and belief, at least one of those instances failed when execution team members mishandled the IV apparatus after establishing a successful IV hook-up, resulting in the IV catheter being yanked out of Broom's vein.

95.6.5. Personnel involved in attempting to execute Broom included at least one non-Team member, viz., Dr. Carmelita Bautista.

95.6.6. After two hours DRC Director Terry Collins requested that Governor Ted Strickland grant a reprieve to postpone the execution process for one week.

95.6.7. Plaintiff Broom requested to speak with his counsel. Defendants denied these requests, citing their execution policy, and then denied counsel's request to speak with Broom.

95.7. On January 7, 2010, Defendants executed Vernon Smith, a.k.a. Abdullah Sharif Kaazim Mahdi. On the day of Smith's execution, TM # 17 was in the hospital. TM # 21 can not recall whether he administered the lethal injections to execute Smith. He cannot recall who else might have participated in the Smith execution, including the identity of the person who replaced TM # 17. Only TM's # 9, # 17, and # 21 are qualified to be part of the IV insertion team.

# V. CLAIMS FOR RELIEF

**First Claim: Eighth and Fourteenth Amendment Violations**

96.　Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten.

97.　Defendants execution policy manifests Defendants' deliberate indifference towards Plaintiffs' constitutional rights. The policy will violate Plaintiffs' constitutional rights to be free from arbitrary, capricious, cruel, and unusually painful punishment, physically and/or psychologically, which rights are secured and guaranteed to each of them by the Eighth and Fourteenth Amendments' limitations on Defendants' powers while acting individually or under the color and authority of state law.

98.　Plaintiffs' respective unique, individual physical and psychological characteristics and conditions create a substantial risk that achieving peripheral IV access on each of them will present a problematic situation analogous to achieving IV access in the previous situations in which Defendants were unable to readily obtain IV access, which, in turn, creates a substantial risk that Plaintiffs will suffer severe, torturous physical and/or psychological pain that is objectively intolerable.

99.　There is a substantial risk that Defendants will fail to apply their informal and formal, written execution policies properly or in accordance with the requirements of said policies, which in turn will subject each

Plaintiff to a substantial risk of serious physical and/or psychological pain, needless suffering, and a torturous, lingering, undignified death that is objectively intolerable.

100. Defendants' pattern of deviations from the policy's written safeguards—safeguards that are essential to alleviate Eighth Amendment concerns—create a substantial risk that Plaintiffs and any and all others on whom Defendants administer the execution policy will not be sufficiently protected by those critical safeguards.

101. Defendants' policy as written and as administered, formal and informal, including but not limited to the protocol, is arbitrary, capricious and cruel and will violate Plaintiffs' rights under the Eighth and Fourteenth Amendments.

102. Defendants' execution policy, including their informal and formal, written policies, as written and as administered, and including Plan A and Plan B, is arbitrary, capricious and presents a substantial risk of serious physical and/or psychological pain, a torturous, lingering death that does not accord with the dignity of man.

103. Defendants' policy is therefore cruel and unusual punishment, and subjecting Plaintiffs to the policy will violate Plaintiffs' rights under the Eighth and Fourteenth Amendments.

**Second Claim: Fourteenth Amendment Due Process Violation**

104. Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten.

105. Defendants have created, maintained, and administered an execution policy that, if used to execute Plaintiffs' respective death sentences, will violate each of their constitutionally protected liberty, life, and property interests, arising from Ohio Rev. Code § 2949.22(A) in expecting and receiving a "quick and painless death." These interests arising under state law are protected as rights under the substantive and procedural elements of the Due Process Clause of the Fourteenth Amendment. Defendants' denial of Plaintiffs' rights to expect and receive a quick and painless death is arbitrary and conscience-shocking.

**Third Claim: First, Sixth, Eights, and Fourteenth Amendment Denial of Access to Counsel, Access to Courts, Due Process, and Right to Petition for Redress of Grievances**

106. Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten.

107. Defendants have an execution policy in place by which they intend to arbitrarily, irrationally, and without a compelling State interest, deny Plaintiffs—as they have other condemned inmates—the right to access their respective counsel so that counsel may give timely effect to Plaintiffs' rights to access the federal and/or state courts, and to petition

Executive Branch authorities for redress of Plaintiffs' grievances if a Plaintiff's execution goes awry.

108. Defendants' execution policy does not provide a right for Plaintiffs' counsel to attend and witness Plaintiffs' executions. Instead, Defendants' execution procedures permit counsel for Plaintiffs to be a witness only if the condemned client gives up one of the three witness seats allotted to him for family or other supporters. *See* Ohio Rev. Code. § 2949.25(A)(5).

109. Plaintiffs have the right to have their respective counsel witness their individual execution just as counsel for Defendants, law enforcement, and the prosecuting attorney have a right to witness the execution. Plaintiffs must be able to exercise this right without being forced to choose between having counsel be a witness in lieu of one of the three persons Plaintiffs can otherwise choose to be witnesses.

110. By imposing these burdens on Plaintiffs, Defendants place conditions on Plaintiffs' rights to have counsel present at a critical stage of criminal proceedings, and those conditions violate Plaintiffs' constitutional rights under the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Fourth Claim: Fourteenth Amendment Equal Protection Violation**

111. Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Amended Complaint as if fully rewritten.

112. Defendants' informal and formal written execution policies, including the policy as written and as administered, violates Plaintiffs' rights to equal protection under the law as guaranteed by the Fourteenth Amendment.

113. Plaintiffs, individually and as a class, have a fundamental right under the Eighth Amendment to be free from cruel and unusual punishment, which Defendants are violating.

114. Plaintiffs, individually and as a class, also have fundamental rights, which Defendants are violating, to the protections afforded by the substantive and procedural elements of the Due Process Clause of the Fourteenth Amendment, which protect rights created by the state Plaintiffs' life, liberty and property interests in expecting and receiving a "quick and painless" execution.

115. Plaintiffs, individually and as a class, also have fundamental rights to access their counsel in order to access the courts, to due process, and to petition for redress of grievances, under the First, Sixth, Eighth, and Fourteenth Amendments, which Defendants are violating.

116. Defendants' pattern of deviations from their policies treats each condemned inmate differently and such disparate treatment severely burdens the class of Plaintiffs' fundamental rights.

117. Plaintiffs are also each a "class of one," similarly situated with any other condemned inmate who has been or will be subjected to Defendants' execution policies.

118. Defendants' pattern of deviations from their policies arbitrarily treats each condemned inmate differently and such disparate treatment is not rationally related in any way to any legitimate state interest.  Thus, Plaintiffs each and individually have been or will be treated differently from other similarly situated individuals, burdening their fundamental rights as a class, and/or without any rational basis for the difference in treatment as a class of one, in violation of the guarantees of the Equal Protection Clause.

119. Defendants' actions administering their execution policy show a pattern of deviations from the written policy, intentionally, recklessly and/or arbitrarily, such that the written policy's safeguards are applied to a particular inmate arbitrarily and disparately.

120. Each individual Plaintiff has been or will be singled out arbitrarily and irrationally as a "class of one" who will not be afforded equal protection as represented by the procedural safeguards in Defendants' written execution policy, when such written safeguards are disregarded, ignored, or otherwise not followed, intentionally and/or otherwise during administration of the execution policy.

121. Defendants also treat or will treat each Plaintiff differently than other similarly-situated individuals (*i.e.*, other condemned inmates), without any legitimate governmental or penological interest, because there will be a difference in how Defendants will administer his execution and apply the policy's written safeguards as compared with how they will

administer another inmate's execution and afford such other inmate the policy's safeguards.

122. Defendants' deviations from their policies are not necessary nor are they the least restrictive means to achieve any compelling state interests.

123. Defendants' deviations from their policies are irrational, they further no legitimate state interests, and/or there is no relationship between the deviations and any legitimate state interest.

124. Defendants' written policy is considered state law, and thus Defendants violate state law when they fail to abide by the written policy's explicit mandates.

125. Defendants have also violated federal law governing controlled substances through their deviations from their written policy.

126. State actions that are clearly contrary to law are irrational, and therefore Defendants' deviations are irrational.

127. Condemned inmates subject to Defendants' execution policy—including each Plaintiff—are dissimilar only in immaterial respects as it relates to Defendants' pattern of deviations, and/or Defendants' deviations are not rationally founded on differences that are real and not illusory.  To the contrary: Defendants' deviations are explicitly *not* based on individual considerations specific to each condemned inmate.

128. By arbitrarily and/or inconsistently following or deviating from the procedural safeguards in Defendant's execution policies, including their written execution policy, and without any justification related to any

specific condemned inmate, Defendants are arbitrarily denying the class of Plaintiffs' fundamental rights under the First, Sixth, Eighth and Fourteenth Amendments, and arbitrarily treating each Plaintiff differently than other similarly situated inmates or irrationally singling him out as a class of one without any relation to differences between Plaintiffs and otherwise-similarly-situated individuals, contrary to law or otherwise without any rational relationship to a legitimate governmental interest.

129.   Accordingly, Defendants are violating Plaintiffs' rights to equal protection under the Fourteenth Amendment.

## IV.  PRAYER FOR RELIEF

A.   Plaintiffs request that this Court grant them injunctive relief under federal law by granting a preliminary and permanent injunction barring Defendants from executing each and all of them by means of their execution policy, including the written execution policy effective March 9, 2011, and any other policy, new or old, formal and/or informal, as written and/or as administered and including the protocol, in order to prevent Defendants from violating Plaintiffs' federal constitutional rights under any or all of the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

B.   In the alternative, Plaintiffs request that this Court grant them injunctive relief by granting a preliminary and permanent mandatory injunction under federal law ordering Defendants to adhere to their informal and formal written policies in any efforts to execute each and any of him by

means of their execution policy, including the written execution policy effective March 9, 2011, or any other policy, new or old, formal and/or informal, as written and/or as administered and including the protocol, to which they have failed to adhere in the same or similar manners as alleged herein.

C.    Plaintiffs requests that this Court grant them injunctive relief by granting a preliminary and permanent injunction barring Defendants from executing them by a means that will deny their respective liberty, life, and property interests in the expectation and receipt of a quick and painless death, which interests are guaranteed by Ohio Rev. Code § 2949.22(A) and protected by the substantive and procedural elements of the Due Process Clause of the federal constitution's Fourteenth Amendment.

D.    Plaintiffs request that this Court grant them injunctive relief by granting a preliminary and permanent injunction barring Defendants from executing each and all of them unless Defendants first allow each of them to exercise his right, under the First, Sixth, Eighth, and Fourteenth Amendments, to choose an attorney to witness his execution without forcing him to choose to have counsel witness at the cost of using one of the three witness slots allotted by Ohio Rev. Code § 2949.25(A)(5).

E.    Plaintiffs request that this Court grant them injunctive relief by granting a preliminary and permanent injunction under federal law barring Defendants from executing each and all of them unless Defendants allow

the condemned inmate to timely access his counsel before and during the execution process, such that counsel can immediately access the courts or otherwise seek necessary relief, in exercise of each Plaintiffs' rights under the First, Sixth, Eighth, and Fourteenth Amendments.

F.    Plaintiffs also request that this Court grant them declaratory relief under federal law by issuing an Order declaring that Defendants' policy will subject all or any of them to a substantial risk of severe physical and psychological pain and suffering, and a torturous and lingering death that offends the dignity of man, resulting in cruel and unusual punishment, whether that method is through the policy's "Plan A" or "Plan B," and will thus violate Plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

G.    Plaintiffs also request that this Court grant them declaratory relief under federal law by issuing an Order declaring that Defendants' lethal injection execution policy, as formally written in DRC Policy 01-COM-11 effective March 9, 2011 or any other similar policy designated by a different DRC Policy number, and as administered including their informal policy and their protocol, violate the First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

H.    Plaintiffs also request that this Court grant them declaratory relief under federal law by issuing an Order declaring that Defendants' policy violates their respective Fourteenth Amendment substantive and procedural due process-protected liberty, life, and property interests in expecting and

receiving a quick and painless death, which interests are created under Ohio Revised Code § 2949.22 and protected as rights by the substantive and procedural elements of the Fourteenth Amendment's Due Process Clause.

I.    Plaintiffs also request that this Court grant them declaratory relief under federal law by issuing an Order declaring that a condemned inmate in Ohio has a right to timely access to counsel throughout the execution process, including administration of the execution protocol, and including to timely access the courts and/or seek redress of grievances from the courts, the Governor of Ohio or any other appropriate person of authority, under the First, Sixth, Eighth, and Fourteenth Amendments, and that Defendants' current policy violates this right.

J.    Plaintiffs also request that this Court grant them declaratory relief under federal law by issuing an Order declaring that Defendants' substantial and demonstrated pattern of deviations from their informal and formal, written policy and the safeguards contained therein before, during and after administration of the policy, without any legitimate governmental interest, treats or will treat each Plaintiff differently than others similarly situated and is arbitrary and irrational, and that the deviations substantially burden the class of Plaintiffs' fundamental rights under the First, Sixth, Eighth, and Fourteenth Amendments, in violation of Plaintiffs' rights to equal protection under the Fourteenth Amendment.

K.    Plaintiffs also request that this Court grant them declaratory and injunctive relief under federal law by issuing an Order ordering Defendants to comply with all training requirements set forth in the written policy, and prohibiting supervisory personnel from allowing execution team member participation in any execution without full compliance with all of the written policy=s training requirements.

L.    Plaintiff requests that this Court grant such further relief as it deems just and proper.

M.    Plaintiffs requests that this Court grant them reasonable attorney fees under 42 U.S.C. § 1988 and the laws of the United States, as applicable.

Respectfully submitted,

OFFICE OF THE OHIO PUBLIC DEFENDER

By: /s/ Gregory W. Meyers
GREGORY W. MEYERS (0014887)
Senior Assistant State Public Defender
Counsel of Record
/s/ Robert B. Barnhart
ROBERT B. BARNHART (0081091)
/s/ Randall Porter
RANDALL PORTER (0005835)
Assistant State Public Defenders

250 E. Broad Street - Suite 1400
Columbus, Ohio  43215
(614) 466-5394
(614) 728-3670  (Fax)

Counsel for Johnnie Baston, Robert Bethel, Romell Broom, Clarence Carter, James Conway III, Shawn Hawkins, Nathaniel Jackson, Donald Ketterer, Billy Slagle, and Arthur Tyler

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 18, 2011, I electronically filed the foregoing *Plaintiffs Johnnie Baston, Robert Bethel, Romell Broom, Clarence Carter, James Conway, Shawn Hawkins, Nathaniel Jackson, Donald Ketterer, Billy Slagle, and Arthur Tyler's Amended Complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit Pursuant to 42 U.S.C. § 1983* with the Clerk of the United States District Court for the Southern District of Ohio using the CM/ECF system, which will send notification of such filing to the parties.

By: /s/ Robert B. Barnhart
ROBERT B. BARNHART (0081091)